[Crim. No. 6352. Second Dist., Div. Two. Mar. 12, 1959.]

THE PEOPLE, Respondent, v. HOWARD D. TAWNEY,
Appellant.

600

Robert E. Ford for Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant was indicted on two counts of violating section 580 of the Business and Professions Code. In count I it was alleged that on February 28, 1957, he "offered to sell a medical and osteopathic degree"; in count 2, that on March 26, 1957, he "sold a medical and osteopathic degree." The jury found defendant guilty on each count. He moved for a new trial and arrest of judgment. Both motions were denied. Proceedings were suspended and defendant was placed on probation for three years on condition, *inter alia*, that he spend the first four months in the county jail, and pay a fine of $1,000. He has appealed from the judgment (Pen. Code, § 1237, subd. 1), from the order denying his motions for a new trial and arrest of judgment, and "any and all other orders prior to or subsequent to the judgment herein or any orders made in lieu of judgment."

In the interest of clarity, it seems desirable to summarize the transactions disclosed by the evidence in the order of their chronology. The first of these relates to a transaction between defendant and one Moskowitz, who was a reporter and writer on the staff of a local television station. On October 10, 1955, Moskowitz telephoned defendant stating that

he had heard that defendant was offering various degrees in connection with certain institutions known as Educational Associates, Inc., and arranged with defendant for an appointment later in the day. Upon arrival at defendant's office on the second floor of a building on North Vermont, in Los Angeles, Moskowitz identified himself as the person who had called earlier that day and made an appointment. Defendant inquired as to the purpose of his visit. Moskowitz stated that he wanted to become an ordained minister; that he was employed by a literary agency at a very small salary; that he had an opportunity to become a lecturer in the field of comparative religion which would enable him to supplement his income, and that he felt if he could become an ordained minister it might help him to get the new position.

As a result of their negotiations, defendant delivered to Moskowitz the next day two documents with his name engraved thereon. One of these showed Moskowitz was an ordained minister; the other that he was a licensed practitioner in "New Thought Science." Each was signed by defendant as "President." For these documents Moskowitz paid defendant $59.

The next transaction relates to the acquisition of a Doctor of Engineering degree by Robert H. Meng, an investigator for the district attorney of Los Angeles County. Meng contacted defendant by telephone on October 8, 1956, and made an appointment to see the defendant at his offices the following evening. At that time, Meng informed the defendant that he would like to get an engineering degree, explaining that he worked with his father-in-law, who was an architect; that his father-in-law was planning to retire, and that he had a chance to take over the business provided he had an engineering degree. Defendant told him he could get an engineering degree for him for $250. Meng stated that he would contact defendant the following week and let him know whether he could raise the money. On October 17th Meng telephoned defendant that he had been able to obtain the money. Defendant informed him that he would have to get a letter of recommendation from his father-in-law and some preliminary plans that he might have drawn. Meng agreed to this. On October 22d Meng telephoned defendant at about 1 o'clock in the afternoon that he had the money, the plans, and the letter from his father-in-law. Defendant told him to come over at 2 o'clock and pick up the degree. At the appointed time, Meng appeared at defendant's office. Meng handed defendant a letter which purported to come from his

father-in-law but which, in fact, had been prepared in the attorney general's office, and two sheets of plans which Meng had had no part in preparing and of which he knew nothing. Defendant glanced at them and inquired whether Meng had the fee. Meng thereupon gave him the $250. Defendant left the room but returned immediately with a blank degree which was signed by the defendant and the secretary of the school. The defendant telephoned to an engraver named Jones advising him that Meng was coming to his place of business. Defendant then gave Meng Jones' address and told him to take the document there and that Jones would engrave it. Pursuant to these instructions, Meng had the words "Doctor of Engineering," the date, and his name engraved on the diploma.

In late November or early December, 1956, Robert G. Wells, an editor and columnist for a Long Beach newspaper, went to defendant's office and told him that he had prepared a manuscript on self-help psychology which he desired to sell to a publisher; that he needed a degree in psychology in order to get a publisher to consider his work. Defendant suggested that for such a purpose Wells would need a doctor's degree. The latter concurred in this suggestion. Defendant made inquiry as to what Wells had been doing. The latter told defendant that he was unemployed but was working on his manuscript and explained some of the philosophy embodied in his treatise. Defendant said that $300 was the normal tuition fee. Wells objected to the amount of the fee on the ground that he had a background in psychology and believed that he had completed all the necessary requirements. He made inquiry as to whether he could take tests rather than attend courses. The suggestions with respect to attending courses and taking tests were eliminated in favor of a thesis. On the basis that there would be no tests to grade and no courses to give, defendant agreed to reduce the price to $200.

Shortly after Christmas, Wells advised defendant that his thesis had been finished and that he was anxious to get a degree because he and his family were going back to Minneapolis. A few days after New Year's Day, 1957, Wells went to defendant's office and told defendant that he had brought a thesis with him which he was prepared to submit as the requirement for the degree. Upon Wells' paying the balance due, defendant gave Wells a diploma filled out in ink which defendant signed. An engraved diploma was later mailed to Minneapolis and forwarded to Wells.

We come now to the transactions on which the indictment is based. On February 26, 1957, Meng again contacted defendant stating that a friend from Denver wanted to get some kind of a medical degree because this friend was going into the shoe business with Meng and another man. An appointment was made for Meng, who was to bring his friend in upon his arrival. On the next day Meng and David Anthony May, a special investigator for the State Board of Medical Examiners, went to defendant's office where Meng introduced May as Mr. Anthony, whom he had known in the service. Meng explained to defendant that they were going to manufacture orthopedic shoes and needed some type of medical degree to aid in the promotion of sales of such shoes, and that since he had received an engineering degree from defendant he thought that defendant might be able to help them out with a medical degree. Defendant stated that he could get them an honorary degree from a local school and one from a school in Paris, but they could not get a medical degree from him because that was a felony. May and Meng acted surprised and said they did not want to become involved, but they would take one honorary degree, which defendant said would cost $100.

On February 28th, Meng telephoned defendant stating that he and "Dave" had discussed the matter and felt that the honorary degree which defendant had offered them would not be satisfactory for their purposes and that he had done some shopping around and had found a place where he could get a medical degree that would cost him $1,500. Defendant told Meng that such a degree would not be worth the paper it was written on, but that he could get them a legitimate medical degree from a university in India, which was formerly located in Chicago, and that the degree would cost them $500. Meng said he would telephone later and let him know their decision. In about an hour Meng telephoned defendant that he and Dave would take the medical degree and two honorary degrees also. Defendant requested a $200 deposit which, however, was reduced to $100 and which was made by May. The next day Meng and May went to defendant's office to discuss the diplomas. May inquired whether the degree was the one from the school in India. Defendant said that it was, and that it would be a degree in osteopathy and that it would be printed in English. Defendant asked for a résumé of May's high school and college work. May explained that he would be out of the city for awhile but that he would send it to Meng, who would deliver it to defendant. Defendant then informed

them that it would take about three weeks to get the degree from India; that it would not be an honorary degree.

On March 12th Meng telephoned defendant to inquire whether he had received the degrees. Defendant stated that he had not received the Doctor of Osteopathy degree yet but that he had one honorary degree. On March 19th Meng inquired of defendant whether he could get the degree from India as that was the one they wanted. Defendant informed him that he could get that degree; that all he had to do was call his contact; he stated that he would probably get it in about a week. Defendant showed Meng a newspaper article about a man named Oosterveen (apparently the defendant in *People* v. *Oosterveen*, see 154 Cal.App.2d 620 [316 P.2d 390]) who had been convicted of selling medical degrees, and said that he thought Oosterveen was in pretty bad trouble. Defendant stated that he still wanted to see "Anthony" and find out when and where he had gone to school.

Defendant called Meng the following day and informed him that he was not going to get a degree from India but instead was going to get one from Italy; that to get one from India would take a week or 10 days while he could get one from Italy in only three or four days. He told Meng that he wasn't too sure of Dave and would rather deal directly with Meng; that he preferred to sell the degrees to Meng rather than to Dave; that by handling the transaction in this fashion, if any difficulty arose, Meng would be involved along with him. Meng said that arrangement was satisfactory to him.

On March 21st May, Ken Kloster, who was also from the State Board of Medical Examiners, and Meng went to defendant's office. Kloster was introduced as the third partner of May and Meng. Defendant showed them a sample of the degree from the school in Italy, pointing out that it was printed in Latin. He translated it for them. The parties discussed the size of the diploma. The defendant stated that the word "honorary" would not appear on the degree. Defendant remarked that he was a little leery about the transaction since the only one he knew was Bob [Meng]. They discussed the idea of defendant's dealing only with Meng. At defendant's request, May signed a statement to the effect that he understood that the degree conferred upon him as a Doctor of Osteopathy would be of an honorary nature and would have no value so far as licensing by any state board was concerned or for the treating of the sick or afflicted. That the degree was issued to him solely as an honorary recognition due to his background in designing corrective shoes.

At approximately 7:30 a.m. on March 26th, defendant telephoned Meng at his home stating that he had the degree which Meng could pick up, but that he should not tell Dave or Ken or anyone else about it. Defendant instructed Meng to come out alone, bring the money, and pick up the degree. Later that day Meng and his partner, Slonaker, went to defendant's office. There were other law enforcement officers downstairs. Slonaker waited in the hall outside the office while Meng entered. Defendant was absent but returned shortly. Defendant said, *inter alia*, "I guess you have got the ready cash?" Meng replied that he had it and asked whether defendant had the degree. When defendant replied in the affirmative, Meng asked to see it. Defendant stated that he did not have it there; that he would have to go and get it; he said he was going right around the corner. Meng suggested that he go with him, to which defendant replied he would rather he did not. Defendant then remarked, ". . . You know this is illegal . . ." After some discussion defendant agreed that Meng could go with him to get the degrees. Meng then gave defendant $600. They walked out through the waiting room to the hallway, around the corner, and into another office. Defendant pointed to a chair on which there was a cardboard cylinder, and said that was it. Meng picked it up and followed defendant back to his office, taking the degrees out as he went. As defendant walked through the waiting room into the office Meng's partner, Slonaker, identified himself, showed defendant a warrant and placed him under arrest.

In the cylinder were three documents, one entitled "Diploma Internationalis Doctoris Ordinis Scientiorum" and containing only the words "Orthopedic Science" and "David Anthony" in English; one entitled "Research University" which was signed by various people including the defendant; and another in Latin, the translation of which was as follows:

"The Phoenix Academy of Study

MCMLII (1952)

To the most beloved and most learned man

David Anthony

with all academic requirements completed, since he has attained the distinguished recognition and plan of

ORTHOPEDICS,

the men in the Phoenix Academy of Study, the power
of the Academy having been conferred through tablets
have bestowed the name and privileges

DOCTOR OF OSTEOPATHY

of the Phoenix Academy of Study. This tablet of
certification fortified by the seal of the
Academy and the signature of the president
publicly and solemnly bears witness that
this has been done.
D. Barii the first of March after the birth of
Christ of the year 1957

(Signature illegible)
Favia Bari Graphic Arts—Rome''

Other law enforcements agents joined Meng and Slonaker
and searched defendant's office while he remained there. During the course of this procedure, defendant looked at two members of the attorney general's staff and remarked: ''Gee, I didn't know this was a felony. I thought it was just a misdemeanor.''

In one of the rooms of defendant's suite there was a cabinet containing seals which made the following impressions: Searchlight College, Incorporated, Nevada; Chirologic College of California, Inc.; Pacific Oxford College, Inc.; Commonwealth University, Inc.; and Research University, Inc. The investigators also found in the suite documents having on them the words ''Research University'' and ''Research University, Council Administration''; ''Commonwealth University, College of Multicomplex Psychology''; ''College of Applied Psychology''; ''Pacific Oxford College''; and ''Golden State University.''

The defendant did not take the witness stand.

Defendant's grounds for reversal may be summarized as follows:

1. That the indictment failed to charge a public offense and the evidence was insufficient to support the verdict of guilty because it was neither alleged nor proved that the degrees offered or sold were made, or purported to be made, pursuant to any laws regulating the licensing of physicians and surgeons in California, and that in fact the uncontradicted evidence showed to the contrary.

2. That the evidence showed, as a matter of law, that he was entrapped by law enforcement officers.

3. That the trial court committed prejudicial error in the admission and rejection of evidence.

4. That the court erred in the giving and refusing of instructions to the jury.

At the outset, we are met with a question of statutory construction; specifically, the meaning of section 580, Business and Professions Code. The People contend that it is a crime, under this section, to sell an osteopathic degree. The defendant, however, contends that the sale of such degree only becomes violative of section 580 if the degree which is sold is made or purports to be made pursuant to a law regulating the licensing and registration or issuing of a certificate to osteopathic physicians in California; that is to say, only a degree which may be used to defraud the California licensing authorities.

Section 580 provides as follows: "No person, company or association shall sell or barter or offer to sell or barter any *medical degree, or osteopathic degree, or chiropractic degree, or drugless practitioner degree or naturopathic degree, or any* degree, certificate or transcript made or purporting to be made pursuant to any laws regulating the licensing and registration or issuing of a certificate to physicians and surgeons, drugless practitioners, chiropodists, midwives, osteopathic physicians and surgeons or drugless practitioners, naturopaths, chiropractors or persons lawfully engaged in any other system or mode of treating the sick or afflicted." (Emphasis added.)

It is defendant's position that the clause "made or purporting to be made pursuant to any laws regulating the licensing and registration or issuing of a certificate to physicians and surgeons" modifies not only the phrase immediately preceding it, viz., "any degree, certificate or transcript," but also that portion of the section which is printed in italics. Defendant then contends, basing his argument upon an analysis of the legislative history of section 580, that only degrees from a medical school which the California licensing authorities will recognize are considered as "made or purporting to be made pursuant to any laws regulating the licensing and registration or issuing of a certificate to physicians and surgeons." Therefore, as the instant degree was not of this type, his acts were not prohibited by section 580.

There are two lines of authority in California relative to

the proper construction of modifying clauses. In *People* v. *Kahn*, 19 Cal.App.2d Supp. 758, 762 [60 P.2d 596], upon which defendant relies, it is held that, quoting with approval from *Porto Rico Ry. etc. Co.* v. *Mor*, 253 U.S. 345 [40 S.Ct. 516, 64 L.Ed 944], "When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."

However, in *City of Santa Barbara* v. *Maher*, 25 Cal.App.2d 325, 327 [77 P.2d 306], cited by the People, this court stated: "It is a settled rule of statutory construction that relative or modifying phrases are to be applied to the words immediately preceding them and are not to be construed as extending to more remote phrases. (Citations.)" This court then quoted from 59 Corpus Juris, 985, as follows: "By what is known as the doctrine of the 'last antecedent,' relative and qualifying words, phrases and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote."

*People* v. *Ortiz*, 86 Cal.App.2d Supp. 937 [195 P.2d 82], pointed out that the rule of the Kahn case, *supra*, also was enunciated in the same paragraph in Corpus Juris as was the rule from the Maher case, *supra*. After quoting from the Maher case, the court in *People* v. *Ortiz, supra*, at page 939, stated: "The paragraph, in Corpus Juris from which the quotation was taken [985], goes on to conclude with this sentence: 'Where several words are followed by a clause as much applicable to the first and other words as to the last, the clause should be read as applicable to all.' This sentence came, with some changes, from *Porto Rico Ry. etc. Co.* v. *Mor* [citation]. The original sentence was quoted, and applied, by us in *People* v. *Kahn* [citation]. . . . We are forced to conclude, therefore, that where two sets of words are followed by a modifying phrase or clause, whether the phrase or clause modifies one or both precedent sets of words, depends upon the meaning that is to be given the sentence, a conclusion that offers no help in ascertaining the meaning." In the Ortiz case, as in the instant prosecution, it was arguable that the modifying clause was applicable to all prior phrases,[1] yet the court limited its appli-

---

[1]The statutory provision under consideration read: "(a) The driver of a vehicle shall yield the right of way to a pedestrian crossing the roadway within any marked crosswalk or within any unmarked cross-walk *at an intersection.* . . ." (Emphasis added.) In this case, it was argued that the italicized phrase modified "within any marked cross-walk."

cation to the phrase immediately preceding it. In the instant case, as in the Ortiz case, we must employ additional means to discover the intended coverage and limitations of section 580, for neither of the above rules offers much assistance. In the case at bar, several salient facts present themselves which aid in ascertaining the true intent of the Legislature. In the first place, if it were the intention of the Legislature to prohibit only the sale of diplomas which could be used to deceive the medical licensing authorities, then that portion of section 580 which we have italicized would serve no purpose whatsoever, for the statute without the italicized language would fully accomplish this purpose. In this regard, it is well settled that statutes should be so construed, whenever possible, as to give effect to each word and phrase therein contained. ▮ In *People* v. *Burns*, 75 Cal.App. 84, at page 88 [241 P. 935], the court stated: "Equally elementary is the uniformly recognized canon of statutory construction that effect must be given, if possible, to every word, clause and sentence of the statute defining the offense, and that no part or word can be ignored, discarded, treated as meaningless, or denied purpose and effect, unless there be irreconcilable contradiction and repugnance." ▮ Therefore, if the italicized portion is to be given meaning, it follows that section 580 prohibits the sale of an osteopathic degree even though such degree is neither made nor purports to be made to deceive licensing authorities.

Our interpretation of section 580 is fortified by considerations of public policy. ▮ The obvious purpose of the section is to protect the public against the deception and chicanery of persons who, by reason of such fictitious degrees, would hold themselves out as possessing learning and skill which they did not in fact have. The spurious parchments denounced by the statute represent that the learning and skill apparently possessed by the holder thereof equip him to administer to the needs of mankind. While the illegitimate character of these "sheep skins" ordinarily would be readily detected by the licensing authorities so that the chances of the holders becoming ostensibly legitimate practitioners are relatively slight, the general public does not make it a practice of inquiring into the genuineness of a diploma nor whether one who has achieved such recognition is duly licensed to practice the particular healing art. It would thus be a simple matter for the holder of a fake diploma or degree to impose upon members of the public, either by carrying on a clandestine practice of a particular healing art for which he was neither licensed

nor trained, or on a nonprofessional basis. The latter situation would arise where the holder of such a degree does not claim to be a licensed practitioner, but holds himself out to be better equipped, because of his apparent specialized training, to deal with a particular problem. Illustrative of this is where the holder of a fictitious osteopathic degree uses it to aid in deceiving the public into believing that shoes made by him possess certain "special" features because of his specialized training in this field. Such conduct would be detrimental to the public interest. Section 580 was adopted to prevent such imposition and frauds upon the public.

Defendant cites *People* v. *Oosterveen*, 154 Cal.App.2d 620 [316 P.2d 390], as authority for the proposition that section 580, if properly construed, could be paraphrased as follows: "No person . . . shall sell . . . any osteopathic degree . . . made or purported to be made pursuant to any laws regulating the licensing and registration or issuing of a certificate to physicians and surgeons. . . ." We are of the view, however, that the Oosterveen case does not support the defendant's position. In that case, the accused sold a medical degree from a purportedly defunct university in Mexico. The information alleged a violation of section 580, Business and Professions Code, in that the accused "did wilfully, unlawfully and feloniously sell and offer to sell a medical degree." Oosterveen argued, as does the defendant in the instant case, that only the sale of degrees made pursuant to the licensing laws was violative of section 580. In considering Oosterveen's argument, the court merely paraphrased the section to conform with his contentions and then stated that the record supported a conviction under the statute as he would have it construed. The court thereby avoided the question of interpretation which now confronts this court. Therefore, this case is of no assistance to the defendant.

Defendant next argues that considering the legislative history of section 580, it is clear that only the selling of degrees which could be used as a vehicle to deceive California licensing authorities was intended to be denounced by the Legislature. In support of this position, our attention is directed to the fact that this section was derived from chapter 79, Statutes of 1927, the title to which read in part as follows: "An act to provide against the selling . . . of any fraudulent degrees, certificates or transcripts to be used in obtaining a license or certificate to practice in the State of California . . ." and that the above title "is of great im-

portance in showing the legislative intent.'' ■ While we agree that the title is a useful guide in determining the intended scope of legislation, it is, of course, not the only one. ■ The fact that the 1927 title did not spell out as one of the purposes of the act an intent to prohibit the mere sale of an osteopathic degree does not necessarily mean such prohibition is not embraced within its scope. (See *People* v. *Jordan*, 172 Cal. 391, 394 [156 P. 451]; *People* v. *Oosterveen*, 154 Cal. App.2d 620, 623-624 [316 P.2d 390]). In *People* v. *Oosterveen*, *supra*, at page 623, the court stated: ''In *People* v. *Jordan* [citation], it was held that where the body of an act embraces provisions that are germane to the general subject stated in its title, the title will be held sufficient to comprehend all of the provisions of the act itself; and where the title suggests to the mind the field of legislation that the text of the act includes, the title will not be held misleading or insufficient, *or the act restricted in its operation.*'' (Emphasis added.) Applying the foregoing to the instant case, it is clear that the title to the act under discussion is sufficient to embrace the acts for which defendant has been tried and convicted. It therefore follows that this aspect of defendant's argument is without merit.

■ Defendant argues that '' [t]he sale of a degree or diploma is not, of itself, immoral or indecent or wrong. It is done every day by our leading educational institutions. True, regulation is necessary to obviate abuses—but a sale of a degree itself is not offensive, unless it tends to deceive a licensing authority.'' Applying this attitude to the facts of the instant case, defendant is in effect contending that it is moral, decent, proper and inoffensive for him to place at large an instrument which could mislead the public into believing that the ostensible holder of the particular degree or diploma had specialized training and upon that basis defraud the public. This position is not worthy of the space which has thus far been expended in stating it. Furthermore, we firmly believe that section 580, as presently constituted, was designed to protect the public from just this sort of abuse, as well as to provide protection from treatment by those who do not meet the standards and requirements established by California authorities.

■ Defendant's position that as the degree was not to be used in California he committed no offense against the laws of this state is factually unsupportable. The degree was sold

here, and that is what section 580 enjoins. This statute in no sense attempts to regulate any conduct outside of California.

▆▆ From the foregoing it is clear that the indictment stated a public offense and it was neither necessary to allege nor to prove that the degree was made pursuant to laws regulating the licensing of osteopaths.

We next turn to defendant's argument that he was entrapped. ▆▆ In *People* v. *Braddock*, 41 Cal.2d 794, 802 [264 P.2d 521], the court states the California approach to this question as follows, quoting from *People* v. *Lindsey*, 91 Cal.App.2d 914, 917 [205 P.2d 1114] : "Where the doing of an act is a crime, regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused and the offense is completed, the fact that an opportunity was furnished, or that the accused is aided in the commission of the crime in order to secure evidence to prosecute him therefor, constitutes no defense. (Citation.) If the officer uses no more persuasion than is necessary to an ordinary sale, and the accused is ready and willing to make the sale, there is no entrapment.''

▆▆ In the present case, the evidence shows that the defendant was aware that the sale of a medical degree was unlawful, for he so stated when asked by Meng and May if he could secure one for them. They did not urge the defendant to sell them one after he said he would not and, in fact, they acted surprised, commenting that they did not want to get involved. The subject was not brought up again until the defendant was informed by Meng that he could obtain a medical degree for $1,500, to which defendant replied, without any solicitation from Meng, that he could procure a legitimate medical degree for $500. From the above it is obvious that less persuasion was employed than is required for an ordinary sale. The defendant's initial rejection was unequivocally accepted, and when the defendant later said he could obtain a legitimate medical degree, he did so upon his own initiative, for at that time no new request was made and the original request had been rejected. No more was done than to furnish the defendant with an opportunity to offer and sell an osteopathic degree. The criminal intent cannot be said to have originated in any other than the defendant's mind. Meng did not ask the defendant to secure a degree, and had defendant not intended to sell the degree, the offer would not have been made by him.

Defendant quotes the following from *People* v. *Bradford*,

84 Cal.App. 707, 712 [258 P. 660], in support of his position that he was entrapped: ''Where the criminal intent originates in the mind of the entrapping person and the accused is lured into the commission of the offense charged in order to prosecute him therefor, no conviction may be had.'' It is clear, however, that the facts of the instant case, when tested by this rule, disclose no entrapment, for instead of showing that the criminal intent was the product of Meng's mind, the evidence is clear that such intent originated in the mind of the defendant.

Likewise inapplicable is *Sorrells* v. *United States*, 287 U.S. 435 [53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249], upon which defendant relies.

It is therefore clear that there is no merit in defendant's asserted defense of entrapment.

 Attention will now be directed to defendant's argument that the trial court committed prejudicial error in the admission and rejection of evidence. First, argues defendant, it was error to admit the testimony of Moskowitz pertaining to the sale to him of religious degrees, and of Wells relative to the sale of a Ph.D. degree in Psychology, and to admit in evidence the blank diplomas and corporate seals found in defendant's office at the time of his arrest. The general rule is that the defendant in a criminal prosecution may only be tried for the offense alleged in the indictment or information and evidence of collateral independent crimes or other acts is inadmissible. There are, nevertheless, several recognized exceptions to this rule. As stated in *People* v. *Albertson*, 23 Cal.2d 550, 576 [145 P.2d 7], ''[e]vidence of other crimes may be admitted when it tends directly to establish the crime charged by proving a material fact, where it is part of the res gestae, or where it helps to disclose motive, intent, premeditation, guilty knowledge, malice, or a common plan or scheme (citations).'' Of similar import is *People* v. *Bean*, 149 Cal.App.2d 299, 302 [308 P.2d 27], where the court stated: ''. . . evidence of other acts of a similar nature may be admitted, when not too remote, to prove a material fact or where it tends to show motive, plan, scheme or system or to show guilty knowledge.'' (See also *People* v. *Guthrie*, 103 Cal. App.2d 468, 471 [229 P.2d 841]; *People* v. *Selk*, 46 Cal.App. 2d 140, 150 [115 P.2d 607].) Furthermore, evidence of other acts is admissible for the purpose of showing intent when the intent accompanying the act is equivocal, or where it is claimed by the defendant that the act was the result of

mistake, accident, or inadvertence, or where intent is otherwise denied. (See *People* v. *Channell*, 136 Cal.App.2d 99, 112 [288 P.2d 326]; 2 Wigmore on Evidence, 202, § 304.)

 It is clear from the evidence that defendant intended to sell the degree in question, but in view of his defense of entrapment it was important to determine whether the idea or intent to make this sale originated with the defendant or the investigators. The testimony regarding the prior sales of degrees and the possession by defendant of blank diplomas and corporate seals was relevant on that issue. It established that defendant was ready and willing to furnish, for a price, fraudulent indicia of educational achievement. He was therefore willing to subject the unsuspecting public to the impositions that would naturally tend to flow therefrom. While the degrees sold to Moskowitz and Wells were not then illegal,[2] as was the sale of the degree in question, the resulting fraud upon the public was no less grievous. The intent and purpose was the same in all these transactions. It is undeniable that the idea or intent to issue these spurious degrees to Moskowitz and Wells originated with the defendant. In view of the similar character of the transactions, it would be reasonable to infer that the idea or intent to issue the degree in question originated with defendant, as it did in the prior instances. Therefore the challenged evidence was admissible.

 Defendant also contends that the blank diplomas and corporate seals were improperly received in evidence on the theory of unlawful search and seizure, since the officers had no search warrant and that no further search for additional evidence was justifiable since the officers had already obtained possession of the documents alleged to have been illegally sold. This court held in *People* v. *Coleman*, 134 Cal.App.2d 594, 599 [286 P.2d 582], "that a search without a warrant is valid where it is incident to a lawful arrest, if it is reasonable and made in good faith; and that a seizure, during such a search, of evidence related to the crime is permissible." (*In re Dixon*, 41 Cal.2d 756, 761-762 [264 P.2d 513]; *Harris* v. *United States*, 331 U.S. 145, 151 [67 S.Ct.

---

[2]The following sections were added to the Education Code in 1958:

"§ 24211. No person, firm, association, partnership or corporation may sell, barter, offer to sell or barter, or conspire to sell or barter, any diploma as defined in this article." (Added Stats. 1958, ch. 13, § 2.)

"§ 24201. As used in this article, 'diploma' means any 'diploma,' 'degree,' 'certificate,' 'transcript,' 'document' or other writing in any language representing that any person has completed any course of study beyond high school. . . ." (Added Stats. 1958, ch. 13, § 2.)

1098, 91 L.Ed. 1399]; *United States* v. *Rabinowitz,* 339 U.S. 56, 61 [70 S.Ct. 430, 94 L.Ed. 653].) In *Agnello* v. *United States,* 269 U.S. 20, 30 [46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409], the court stated: "The right without a search warrant contemporaneously to search . . the place where the arrest is made in order to find and seize things connected with the crime . . . is not to be doubted."

In the instant case the arrest unquestionably was lawful and the search was made as an incident thereto. There is nothing to suggest the search was not made in good faith or that it was unreasonable either in scope or manner of execution; and the items seized were proper for evidentiary use in establishing the very crime for which defendant was arrested and were used exclusively for this purpose. As above pointed out, this evidence was admissible on the issue of entrapment, and certainly the officers were at liberty to seize admissible evidence incident to a lawful arrest.

In *People* v. *Mills,* 148 Cal.App.2d 392 [306 P.2d 1005], relied on by defendant, it was held that evidence seized without a search warrant at the time of the defendant's arrest was not admissible to support convictions of offenses other than the one for which he was arrested. In the instant case, however, the evidence obtained when defendant was arrested was used exclusively to support the very offense for which he was arrested.

Defendant next argues that the court erred in sustaining objections to the proffered testimony of George Ruppers. By this witness, the defendant offered to prove that the diploma involved would not be recognized by the California Board of Osteopathic Examiners. As section 580 prohibits the mere sale of such a diploma, the question whether or not the California authorities would or would not recognize it is wholly immaterial and, therefore, evidence relative to this question was properly excluded.

Finally, defendant contends that the court erred in giving the following instruction: "Section 580 of the Business and Professions Code of the State of California, insofar as it is applicable to this case, provides as follows: 'No person . . . shall sell or barter or offer to sell or barter any medical degree, or osteopathic degree. . . .' " In view of our interpretation of section 580, this was a proper instruction and there was no need to read all of section 580 to the jury.

Furthermore, it was not error to refuse to give the instructions requested by the defendant which read in part as

follows: ". . . you must find from the evidence beyond a reasonable doubt, that any degree which may have been offered for sale or sold was to enable the person to whom it was offered for sale or sold to secure a certificate of physicians and surgeons." Since, as already pointed out, the diploma or degree need not be used to secure a certificate or license in order to violate section 580, this proposed instruction was properly refused.

Since there is no appeal from an order denying a motion in arrest of judgment, the attempted appeal from such order is dismissed. (*People* v. *Proctor*, 46 Cal.2d 481, 483 [296 P.2d 821]; *People* v. *Smyre*, 165 Cal.App.2d 651 [332 P.2d 391].) Defendant's purported appeal from orders prior to judgment is dismissed, since such orders are reviewable on appeal from the judgment. As the record does not disclose any orders made after judgment, the purported appeal therefrom is also dismissed. The only order made in lieu of judgment was the order granting probation which is "deemed to be a final judgment" for purposes of appeal. (Pen. Code, § 1237, subd. 1.) The order denying motion for a new trial and the judgment are affirmed.

Ashburn, J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 6, 1959.