[Crim. No. 6585. Second Dist., Div. One. Dec. 31, 1959.]

THE PEOPLE, Respondent, v. ROBERT HENRY RED-DICK et al., Defendants; JOHN F. STATHAM, Appellant.

Fizzolio & Fizzolio for Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment of conviction (order granting probation) and from an order denying a motion for a new trial in a case involving a violation of the

provisions of (sic) section 182.5 (§ 182) of the Penal Code (conspiracy) and section 580 of the Business and Professions Code (sale of degrees, etc.)

In an information filed in Los Angeles County the defendants were charged in Count I with conspiracy to violate (sic) sections 182.5 (182) of the Penal Code and section 580 of the Business and Professions Code in that on or about August 30, 1957, they did "willfully, unlawfully and feloniously sell and offer to sell a medical degree, or any degree, certificate or transcript made or purporting to be made pursuant to any laws regulating the licensing and registration or issuing of a certificate to physicians and surgeons." The jury found the defendants guilty on both counts.

A résumé of the facts is as follows: Frank G. Nolan attended the College of Osteopathic Physicians and Surgeons in Los Angeles, and graduated therefrom with a D.O. Degree in 1933. He received his license to practice as an osteopathic physician and surgeon in California in 1934. In 1946 he received a Doctor of Medicine Degree from Metropolitan University, an unaccredited school not recognized by the American Medical Association in which a physician and surgeon, D.O., could attend for a year and then receive a Doctor of Medicine Degree.

Early in 1957, Dr. Nolan sent an application to appear before the Board of Medical Examiners of the State of Maryland (Homeopathic) for an examination to practice medicine and surgery in Maryland. He dated the application June 10, 1956, and accompanied it with a statement, also dated June 10, 1956, stating that he believed he was qualified to take the examination. He also sent with the application a transcript of his courses at the College of Osteopathic Physicians and Surgeons, and a statement of the dean of the College of Medicine of Metropolitan University to the effect that Dr. Nolan had received an M.D. degree in 1948. The latter statement was dated May 24, 1956. Also enclosed with the application was Dr. Nolan's check for $50, dated June 10, 1956, and payable to the Secretary of the Board of Medical Examiners, State of Maryland. The check was returned cancelled, with the endorsement on the back "SECRETARY BOARD OF MEDICAL EXAMINERS STATE OF MARYLAND. Maryland State Homeopathic Medical Society. (Signed) Robert H. Reddick, M.D."

About February 7, 1957, Dr. Nolan contacted the California State Medical Board. In order to cooperate with them

in every way, recording devices were installed and the conversations with the defendants were recorded.

Prior to August 26, 1957, Dr. Nolan received in the mail a card stating: "This is to Certify That Frank Nolan, M.D. Is a Member in Good Standing of the Homeopathic Medical Society of the State of Maryland with dues credited for the year ending 1957-1958. Robert H. Reddick, M.D." Subsequently, Dr. Nolan received a telephone call from a man identifying himself as the appellant, John F. Statham. After ascertaining that Dr. Nolan was still interested in obtaining a Maryland license to practice medicine, an appointment was made. On the evening of August 26, 1957, appellant and his wife went to Dr. Nolan's home.

Appellant told Dr. Nolan that Reddick had asked him to "get in touch" with the doctor. Dr. Nolan asked the appellant if he was planning to get a California license, and appellant said that he was "waiting for this thing to simmer down in Maryland" before he filed for reciprocity; that Dr. de los Reyes, the vice-president of the Medical Board was a "friend" of his; and that he had a "very direct in to the Medical Board through a man named Ventura Blanco." Dr. Nolan asked appellant "what's the deal," and appellant said that he could not discuss "any deal" with Dr. Nolan because he didn't know anything about it, and had come out just to tell him that Reddick wanted him "to have the ticket (license) if you wanted it." He told Dr. Nolan that if a man had been practicing 10 years or longer he could be licensed by special examination. He said that the law did not say he had to go to Maryland to take the examination, but it was a foregone conclusion that one was supposed to. He said that Dr. Nolan would take it here without going back there, and if he was questioned about it, he "would have to say . . . that you went back . . . and took it in Maryland." He also told Dr. Nolan that California gave reciprocity to Maryland. Dr. Nolan asked when Reddick would be in town. The appellant said he was coming back by Tuesday or Thursday, and whatever Dr. Nolan had to say to him about money was his business, and that appellant didn't want any part of that at all. He said that if Dr. Nolan was going to make the deal with Reddick he would "have the license certificate," as Reddick had it with him, and it had to be engrossed before Reddick left, because he would not leave it there blank as somebody might sell it for $5,000. Dr. Nolan inquired as to whether the Metropolitan degree and the license to practice in Maryland would

make one eligible for the armed services, and the appellant said if one was registered with the board there was no reason why he couldn't get in. Appellant asked how many of those Metropolitan people there were, and Dr. Nolan said about 300. Appellant said that he thought Reddick would go for a few of them, but not 300; that once you got the license it was a chattel property under the law and nobody could take it away from you. When Dr. Nolan mentioned the price, appellant said there was a $500 legislative assessment to the society which everybody paid, and he didn't know anything about any amount over and above that, and Reddick didn't commission him to say anything about money. He said he was simply an emissary and not a salesman.

The next morning it was arranged that the appellant and Reddick would go to Dr. Nolan's office about 10 o'clock in the morning of August 27, 1957. At that time Dr. Nolan met Reddick, who said that compliance with the Medical Practice Act required only that the applicant be more than 21 years of age, of good moral character, and show evidence of having received a diploma conferring the degree of doctor of medicine from a legally incorporated medical college. Reddick said, "Most of the individuals who have been licensed by the Homeopathic Board, which is the board representing the Homeopathic Society, are also members of the Homeopathic Society. The Society as you may know has been involved not through choice but through necessity in a number of law suits and legal battles. Three assessments have been voted at different times at regularly convened Society meetings. This is the sum total which comes to seven fifty ($750.00) and it is a Society matter and has nothing to do with the examinations of the board as such. This is not stated in the law and of course there is no official status to this remark, but what it amounts to is one who is a member in good standing of the Society received the license from the board representing the Society practically on an automatic basis. There is no such thing as the Society selling any licenses. It has no authority. If it purported to do so, why, there would be no validity to it, any*one*, and the two are separate and distinct. What it amounts to is, becoming a member of the Society in good standing, having paid the assessment totalling seven fifty, why, the licens*er* is simultaneous in substance, that is."

Reddick said that many people appeared "to be interested" in getting the Maryland license because "reciprocity really existed in Maryland and ... forty-two states and territories";

and that a state having reciprocity with Maryland must give reciprocity to the licentiates of both of the Maryland boards, or there is no reciprocity. He said that there were only six states that were not on the list for reciprocity, but that California reciprocated. Dr. Nolan said that he would like to get a license and demand reciprocity, and the appellant said there was no reason why he couldn't do it if he filed a suit in mandamus. Dr. Nolan told Reddick that he thought there were close to 300 graduates from Metropolitan, the majority of whom were in Southern California. The appellant said that he and Reddick had discussed that, and that Reddick had said that as for those who wanted in, "it was a gradual proposition," but taking "too many at one time it would be inimical to the welfare of everyone," and "would cause a general discussion all over the state." The appellant said that they had put a limit of eight on the "first batch." Appellant told Dr. Nolan that "the best thing" for him to do was "to go ahead" with his "deal," and after he had got it, then to bring them into it gradually. Appellant said that the licenses were "not for sale as such," but would be issued under the provisions of the law which provided for special examinations and because of being in practice for a number of years. He said that "what Dr. Reddick doesn't want to happen is anybody who is a greenhorn and who might . . . pop off."

On August 28, 1957, the appellant went again to Dr. Nolan's home, taking with him a document which stated:

"The Board of Medical Examiners of the State (SEAL) of Maryland

"To all whom it may concern, Greeting:

"Be it known that Frank G. Nolan, M.D. on the 5th day of May, A.D., having offered us satisfactory proof that he was more than twenty-one years of age, and had received a proper preliminary education; we therefore gave a written order for the examination of said Frank G. Nolan, M.D. before one of the boards of medical examiners of the State of Maryland; that the said Frank G. Nolan, M.D. was fully examined before our said board and found proficient and qualified to practice medicine and surgery, we, therefore, have granted to said Frank G. Nolan, M. D. this our

"License to Practice Medicine and Surgery in the State of Maryland as a physician and surgeon, and have caused the names of the president and secretary of our board to be subscribed and the seal of our society affixed hereto.

"Witness our hands and the seal of our society this 13th day of May, 1957, A.D.

Robert H. Reddick, M.D. Robert D. Brown, M.D.
 Secretary President
(SEAL) 2088.)"

Appellant also took to Dr. Nolan's home a document as follows:

"Maryland State Homeopathic Medical Society
(SEAL)
Founded 1875
Be it known that,
FRANK G. NOLAN, M.D.

having been graduated from an Approved School of Homeopathy teaching a Resident Course, and said school having conferred the Degree of

Doctor of Medicine

and having given satisfactory evidence of practice in the science, art and philosophy of homeopathic medicine and surgery to our Membership Board is duly

Registered

as a member, and is entitled to all rights, privileges and benefits of the Society.

"In testimony whereof we have hereunto subscribed our names and affixed the Seal of the Society on the 13th day of May 1957 in the State of Maryland.

Robert D. Brown, M.D. Robert H. Reddick, M.D.
 President Sec. Treasurer
(SEAL)"

The appellant left the two documents with Dr. Nolan, who had said that he wanted to see what he was buying. Dr. Nolan asked about the examination, and the appellant said he would "have to write some grey books," but that he knew the questions and the answers. He asked Dr. Nolan when he had put his application in, and Dr. Nolan said that it was early in May, that the 5th of May was about right. The appellant said that they had authorized an examination down there, and "this" was dated May 13th. He said that Dr. Nolan's was supposed to be a special examination, and that Dr. Nolan would have to remember that he was supposed to have had a special examination back there. Appellant said that there was a legitimate

assessment of $500 which everybody paid and which went into the society. When Dr. Nolan asked him about the other $250, appellant said that it went to Reddick.

At about 7 o'clock in the evening of August 30, 1957, Reddick and the appellant went to Dr. Nolan's office. Dr. Nolan asked if he wanted the $750 in cash and Reddick said that cash was always preferable. Dr. Nolan indicated that he would like to get his $750 back, and asked whether it was all right, if he made contacts on his own and Reddick got $750, if he (Dr. Nolan) got what he could out of it, e.g., if he charged a thousand and kept $250 and gave Reddick $750. Reddick said that was quite all right. Appellant asked why he didn't charge $1,250 and give him $250. Reddick said that he had no objections to whatever there might be on top. Dr. Nolan gave Reddick $750 in cash. Reddick and the appellant left and were placed under arrest.

Dr. Nolan subsequently received, in letters postmarked September 11, a receipt for $50 and a letter from the Medical Examiners, State of Maryland, and receipts for $100, $150, and $500, stating that the latter sums were received as payments of assessments.

Appellant asserts some five grounds why the orders denying his motion for a new trial and granting probation should be reversed.

First, he claims that section 580 of Business and Professions Code does not prohibit the sale of a document which could have no legal effect in California; that a homeopathic license could have no legal effect in California; and that therefore he was not guilty of any offense.

Section 580 of Business and Professions Code provides:

"Sale or barter of degree, certificate or transcript. *No person,* company or association *shall sell or barter or offer to sell or barter* any medical degree, or osteopathic degree, or chiropractic degree, or drugless practitioner degree or naturopathic degree, *or any degree, certificate or transcript made or purporting to be made pursuant to any laws regulating the licensing and registration or issuing of a certificate to physicians and surgeons,* drugless practitioners, chiropodists, midwives, osteopathic physicians and surgeons or drugless practitioners, naturopaths, chiropractors or persons lawfully engaged in any other system or mode of treating the sick or afflicted." (Emphasis added.)

Appellant contends that since this case deals with a license which California doesn't recognize, and not with a degree,

that California is enforcing the penal laws of a sister sovereign state. Numerous authorities are cited for the proposition that one state will not enforce the penal laws of a sister-state. With this proposition we are in accord, however, appellant predicates his argument upon an erroneous premise.

The court in *People* v. *Tawney,* 168 Cal.App.2d 599 [336 P.2d 659], in answering a similar contention stated at page 613:

"Defendant's position that as the degree was not to be used in California he committed no offense against the laws of this state is factually unsupportable. *The degree was sold here, and that is what section 580 enjoins. This statute in no sense attempts to regulate any conduct outside of California.*" (Emphasis added.)

Again, the court was faced with a similar argument in the still more recent case of *People* v. *Allen,* 170 Cal.App.2d 584 [339 P.2d 642]. The court cited the Tawney case and stated at page 587:

". . . *the sale of the degree in this state constituted a violation of the statute regardless of whether or not the degree was purportedly issued pursuant to laws regulating the licensing of practitioners of any healing art or science.*" (Emphasis added.)

The reasoning behind section 580 is set forth in *People* v. *Tawney, supra,* and quoted with approval in *People* v. *Allen,* 170 Cal.App.2d 588, wherein it was stated:

" 'Our interpretation of section 580 is fortified by considerations of public policy. *The obvious purpose of the section is to protect the public against the deception and chicanery of persons who, by reason of such fictitious degrees, would hold themselves out as possessing learning and skill which they did not in fact have.* The spurious parchments denounced by the statute represent that the learning and skill apparently possessed by the holder thereof equip him to administer to the needs of mankind. While the illegitimate character of these "sheep skins" ordinarily would be readily detected by the licensing authorities so that the chances of the holders becoming ostensibly legitimate practitioners are relatively slight, *the general public does not make it a practice of inquiring into the genuineness of a diploma nor whether one who has achieved such recognition is duly licensed to practice the particular healing art.* It would thus be a simple matter for the holder of a fake diploma or degree to impose upon members of the public, either by carrying on a clandestine practice of a par-

ticular healing art for which he was neither licensed nor trained, or on a nonprofessional basis. *The latter situation would arise where the holder of such a degree does not claim to be a licensed practitioner, but holds himself out to be better equipped, because of his apparent specialized training, to deal with a particular problem. . . . Such conduct would be detrimental to the public interest. Section 580 was adopted to prevent such imposition and frauds upon the public.' "* (Emphasis added.)

The same detriment to the public interest would be accomplished in California by the use of a license to practice as a physician and surgeon in Maryland as those suggested by the court as being possible by the use of a fictitious osteopathic degree in the Tawney case or fictitious naturopathic degree in the Allen case. ▆ Although section 580 does not expressly use the word "license," it is encompassed within its purview. In *Hahn* v. *State of Wyoming* (1958), 78 Wyo. 258 [322 P.2d 896, 899], it was stated that the word "certificate" is synonymous with "license."

Appellant's second assertion of error is that there was no evidence that the license to practice as a physician and surgeon was sold to Dr. Nolan.

▆ As an appellate court, we are bound by the rule set forth in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], to the effect that we must assume in favor of the judgment the existence of every fact which reasonably could be deduced from the evidence. As stated at page 681:

"If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (Citations.)"

▆ The evidence in the instant case shows, among other things, that the appellant telephoned Dr. Nolan and asked him if he was still interested in obtaining a license to practice in Maryland, and that when Dr. Nolan said that he was, the appellant said that he would like to talk to him and they made an appointment; that appellant stated that if Dr. Nolan was going to "make a deal" with Reddick, he would have the license certificate as Reddick had it with him and it would have to be engrossed with Dr. Nolan's name; that there was a $500 assessment to the society and that he didn't know anything about anything over and above that because Reddick didn't commission him to say anything about money at all;

that there was some fear that a "greenhorn" might "pop off." When Dr. Nolan inquired about the examination, and the appellant said that he had to write some blue books, "and, well, hell, I mean, you know the questions and answers both, you know, let's face it." Dr. Nolan was supposed to have taken a special examination in Maryland. The appellant said that there was a legitimate assessment of $500 which everybody paid into the society. When Dr. Nolan asked appellant where the $250 went, appellant said that it went to Reddick. When the $750 was paid on August 30, 1957, Dr. Nolan indicated that he would like to recoup the $750 and Reddick indicated that it was quite all right so long as Reddick got the $750. Appellant asked why he didn't charge $1,250 and give him (appellant) $250.

From the evidence that the "License to Practice Medicine and Surgery" stated on its face that Dr. Nolan was fully examined before the board and found proficient and qualified to practice medicine and surgery and therefore the board granted him the license, which license the appellant delivered to Dr. Nolan, and from the evidence that the appellant told Dr. Nolan that he must remember that he was supposed to have taken a special examination "back there," it can reasonably be inferred that the appellant was quite aware that the license being given to Dr. Nolan was not based upon his medical qualifications and the length of his practice as an osteopath in California, and that he was aware that the license was being given to Dr. Nolan solely in exchange for money, based on the fiction that he had qualified for it by examination, when in fact it was given for money without regard to qualifications, and that he was telling Dr. Nolan how to circumvent the Maryland law by a lie about the examination.

■■■ The fact that the license was delivered to Dr. Nolan some two days before he paid the $750 to Reddick did not preclude a finding of "sale." There is evidence to show that Dr. Nolan said that he wanted to see what he was buying.

In view of the evidence before the trial court, it cannot be said that as a matter of law Dr. Nolan was voluntarily and unconditionally given the license, and that therefore his payment of $750 to Reddick was a purely voluntary gift.

■■ The appellant's third assertion is that the trial court committed prejudicial error in admitting into evidence, subject to a motion to strike, certain telephone conversations which Dr. Nolan had with a man who identified himself as

Dr. Senese, and who had offered Dr. Nolan a Maryland Medical license for $1,000.

The testimony of Dr. Nolan which was objected to as hearsay, and which was admitted on the question of conspiracy subject to a motion to strike if it was not connected up, was that early in the morning of January 20, 1957, Dr. Nolan received a telephone call from a man who introduced himself as Dr. Senese. Senese said that he represented the Medical Examiners of the State of Maryland. He said that he was going to send Dr. Nolan an application, and that Dr. Nolan should date his check back several months. Thereafter, Dr. Nolan received applications in the mail. The applications were to be filled out to become a member of the Medical Society in Maryland. Dr. Nolan filled them out and sent them, with his check predated to June 10, 1956, for $50, to the person to whom he had spoken on the telephone.

On or about February 7, 1957, Dr. Nolan had a second telephone call from the man representing himself as Dr. Senese. Senese said that he was sitting with the Board of Examiners at the time; that Dr. Nolan had complied with all of the regulations; and that they were ready to issue his license. Then Senese asked, "How would a $1,000.00 suit you?" When Dr. Nolan asked what he meant, Senese said, "Well, that is what it is going to cost you because we can't just give these away." Dr. Nolan said that he didn't have any thousand dollars, and Senese asked, "Well, how about $500.00?" Dr. Nolan asked him, "Well, how about $250.00?" and Senese answered, "No, it will have to be $500.00 within the next week because I think we are going to be out of business by that time." Dr. Nolan said that Senese would be hearing from him. About August 15, 1957, Dr. Nolan had another telephone call from the man representing himself as Dr. Senese. Senese told him that Reddick was coming to California and would get in touch with Dr. Nolan, and asked if Dr. Nolan was still interested in the license. When Dr. Nolan answered in the affirmative, Senese said that Reddick would see him.

When the People rested, appellant (out of jury's presence) moved to strike the testimony of Dr. Nolan with respect to his conversations with Senese and the motion was granted. The court then instructed the jury as follows:

"Ladies and gentlemen, in your absence we ruled on a motion to strike all the testimony relating to Anthony M. Senese and this motion was granted on the basis that there has been no absolute tie-in with Dr. Senese or Anthony M.

Senese and this defendant and anything relating to Mr. Senese is to be disregarded. Any tie-in between Senese and the defendant here is to be absolutely disregarded and all the conversation between Dr. Nolan and Mr. Senese is to be disregarded and stricken.''

▆▆ As stated in *People* v. *Carner,* 144 Cal.App.2d 687, 692 [301 P.2d 623]:

''Where evidence is stricken out on motion of defendant and the jury is admonished to disregard it, any error in admitting such testimony is generally cured. (*People* v. *Bolton,* 215 Cal. 12, 18-19 [8 P.2d 116].) The jury is presumed to obey such orders. (*People* v. *Pearson,* 111 Cal.App.2d 9, 21 [244 P.2d 35]; *People* v. *Young,* 25 Cal.App.2d 148, 156 [77 P.2d 271].)''

It will be presumed on appeal, in the absence of any affirmative showing to the contrary, that no prejudice resulted. (*People* v. *Malley,* 49 Cal.App. 597, 612-613 [194 P. 48]; *People* v. *Montez,* 175 Cal.App.2d 303, 307 [345 P.2d 938].)

▆▆ While it might have been preferable for the trial court to require an offer of proof prior to the complained of testimony, there is nothing to indicate that the jury did not adhere to the court's admonition. An examination of the record fails to disclose that a miscarriage of justice resulted.

▆▆ Fourthly, appellant asserts that Count One (I) of the information did not charge a public offense. The information read in part as follows:

''The said ROBERT HENRY REDDICK and
JOHN F. STATHAM

''Are accused by the District Attorney of and for the County of Los Angeles, State of California, by this information, of the crime of CONSPIRACY TO VIOLATE SECTIONS 182.5 of the PENAL CODE OF CALIFORNIA, and SECTION 580, BUSINESS AND PROFESSIONS CODE,
a felony, committed as follows: That the said

''ROBERT HENRY REDDICK and JOHN F. STATHAM between January 2, 1957 and August 30, 1957 at and in the County of Los Angeles, State of California, did willfully, unlawfully and feloniously conspire, combine, confederate and agree together to offer, sell and offer to sell a certificate purporting to license Frank G. Nolan to practice medicine and surgery in one of the States of the United States, to wit, Maryland, and to do acts which endanger the public health.

"That pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid combination, agreement and conspiracy, the defendants committed the following overt acts:" (Many overt acts were then listed and then set forth.)

Appellant's contention is predicated upon the fact that Count One (I) of the information charges appellant with violation of section 182.5 of the Penal Code, but that no such section exists. The pertinent provisions of section 182, Penal Code, read as follows:

"If two or more persons conspire:

"1. To commit any crime.

"2. . . . . . . . . . . . .

"3. . . . . . . . . . . . .

"4. . . . . . . . . . . . .

"5. To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws.

"6. . . . . . . . . . . . .

"They are punishable as follows:

" . . . . . . . . . . . . "

It is well established that an information is sufficient if it be "in any words sufficient to give the accused notice of the offense of which he is accused." (*People* v. *Marshall*, 48 Cal.2d 394, 399 footnote 5 [309 P.2d 456]; *People* v. *Severino*, 122 Cal.App.2d 172, 181 [264 P.2d 656].)

It is also established that surplusage does not vitiate an information and it may be rejected if enough remains to charge the offense. (*People* v. *Randazzo*, 48 Cal.2d 484, 489 [310 P.2d 413]; *People* v. *Matula*, 52 Cal.2d 591 [342 P.2d 252].) Under the aforementioned principle, the words "SECTIONS 182.5 OF THE PENAL CODE OF CALIFORNIA, and . . ." of the information may be treated as surplusage and rejected. There remains enough to charge that Reddick and the appellant conspired to violate Business and Professions Code, section 580, in that during a specified time they conspired to offer, sell and offer to sell a certificate purporting to license Frank G. Nolan to practice medicine and surgery in Maryland, acts which are clearly forbidden by Business and Professions Code, section 580. The information was sufficient to give appellant notice of the offense of which he was accused.

The same reasoning is applicable to the verdict. The verdict in the instant case, as to count I, was as follows:

"We, the jury in the above entitled action, find the Defendant John F. Statham guilty of violation of section 182.5

Penal Code, a felony as charged in count 1 of the information."

 No particular form of verdict is required, so long as it clearly indicates the intention of the jury to find the defendant guilty of the offense with which he is charged. [11] It is sufficient if it finds him guilty by reference to a specific count contained in the information. (*People* v. *Mercado*, 59 Cal.App. 69 [209 P. 1035]; *People* v. *Flohr*, 30 Cal.App.2d 576, 581 [86 P.2d 862]; *People* v. *Fisher*, 86 Cal.App.2d 24, 31 [194 P.2d 116].) In *People* v. *Fisher, supra*, the court quotes 8 California Jurisprudence, section 430, page 400, wherein it is stated:

 " '. . . In giving effect to the manifest intention of the jury, matters of surplusage and clerical errors will be disregarded.' "

 Thus, by striking ". . . of violation of section 182.5 Penal Code, a felony . . .," of the verdict, the remainder of the verdict clearly indicates the unqualified intention of the jury to find the appellant guilty of the identical offense set forth in Count I of the information, and it was therefore a sufficient finding that he was guilty of conspiracy to violate Section 580, Business and Professions Code.

Finally, appellant asserts that he was deprived of his constitutional rights under the Fourteenth Amendment, in that he was denied due process of law. All aspects of this argument have previously been answered.

The order denying the appellant's motion for a new trial and the order granting probation are and each is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 24, 1960.