Filed 2/7/23 P. v. Robinson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICHARD ROBINSON,<br><br>Defendant and Appellant. | C092575<br><br>(Super. Ct. No. STK-CR-FE-2016-0005335)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed in this case on January 18, 2023, be modified as follows:

On page 10, second full paragraph, first sentence, replace "was" with "were" so that the sentence [with the footnote remaining the same] now reads:

Although defendant argues the trial court's changes to CALCRIM No. 3551 were coercive, we disagree.

1

On page 10, second full paragraph, after the last sentence ending with "suggests" insert the following:

Similarly, we disagree that the trial court "directed" the jurors by suggesting they review the elements of the relevant crimes. The trial court's comment that reviewing the elements of the relevant crimes could "be of assistance . . . in reaching a decision" did not imply a preference for any particular verdict or even require the jurors to reach agreement.

This modification does not change the judgment.

The petition for rehearing is denied.

FOR THE COURT:


_____/S/_____
MAURO, Acting P. J.


_____/S/_____
RENNER, J.


_____/S/_____
HOCH, J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 1/18/23  P. v. Robinson CA3 (unmodified opinion)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICHARD ROBINSON,<br><br>Defendant and Appellant. | C092575<br><br>(Super. Ct. No. STK-CR-FE-2016-0005335) |

A jury found defendant Richard Robinson guilty of murder, robbery, burglary, and the unlawful taking of a vehicle.  It also found him sane.  The trial court sentenced him to life without the possibility of parole and ordered him to pay, among other things, a parole revocation fine.

1

Defendant now contends (1) the trial court coerced the sanity phase verdicts by directing the jurors to continue deliberating after they declared a deadlock, (2) the trial court should have instructed on petty theft as a lesser included offense of robbery, (3) defense counsel was ineffective in failing to request pinpoint instructions on the effects of mental illness and hallucinations on specific intent, (4) a verdict form error requires reversal, (5) the trial court should have granted mistrial after witnesses testified that defendant had been incarcerated, and (6) the trial court improperly imposed a parole revocation fine.

Finding merit only in defendant's final contention, we will modify the judgment to strike the parole revocation fine and affirm the judgment as modified.

BACKGROUND

In 2016 defendant had been living in Missouri but took a bus to California and eventually called his family from a local hospital. When his mother picked him up, defendant looked like he had been living on the street. During the time he stayed with his family he exhibited strange behavior, such as hitting his head, pulling his hair, and grabbing at the faces of pets. Defendant had an episode at the Department of Motor Vehicles where he was pacing and agitated. That evening he slapped himself and talked about the idiot in his head.

On the evening of April 13, 2016, defendant called 911 and said he was on his grandfather Kirby Robinson's front porch and wanted his grandfather "to pull the tube out of my ass that he shoved in my ass when I was a kid and he didn't pull it out." A recording of the call was played at trial. When police arrived, the conversation was recorded with an officer's body camera and the footage was played for the jury. Among other things, defendant claimed his grandfather had inserted a tube in defendant's anus when defendant was eight years old "but he didn't pull the tube out." Defendant wanted the police to look under the counter in the grandfather's bathroom for the tube to "see if it's actually there. So that he can pull that tube out of my ass." He claimed the tube was

2

still in him because it was an "immovable object . . . it's all a whole soul thing." Defendant said he had used methamphetamine days earlier. Defendant asked the police to knock the door down because his grandfather did not answer the door; the police declined. The police dropped defendant off at a homeless shelter.

The next morning defendant informed his mother that he broke into his grandfather's home, stabbed the grandfather, took one or more items of his personal belongings, and also took his truck. Defendant's brother found the grandfather's body with stab wounds and bruises. A sliding glass door had been shattered and a rock was found inside. Police also found a stake from a landscape light inside. The victim's truck was missing. An autopsy showed that the grandfather had nine stab wounds to his chest, blunt force trauma to his head, and defensive wounds on his hands and elbows.

That same morning, defendant drove to a Denny's restaurant. Defendant ate breakfast, paid his bill, then left the restaurant. An individual named Derek Oaklay lacked permanent housing and would frequently hang around the back of the restaurant. Defendant later rushed back into the restaurant bathroom with blood on his clothing. He appeared to be washing blood from his hands in the bathroom. Shortly after, a group of customers left the restaurant and found Oaklay's body behind the building. When police arrested defendant a short distance from the restaurant he had a bloody knife in his pocket. An autopsy showed Oaklay died from stab wounds.

Police detectives subsequently interviewed defendant. Defendant told detectives he killed his grandfather at the grandfather's home. Defendant said he broke in and was looking for "the bottle -- the tube. Wasn't there so I got angry. And I beat him. Kicked him out of his house. Beat him some more. Stabbed him. And I beat him some more." He admitted stealing from his grandfather and said he had stabbed him with the same knife he used to stab Oaklay. Defendant said he entered his grandfather's house by breaking the sliding glass door with a rock, cutting the screen with a knife, then using the metal stake he had taken from a neighbor's lawn to clear the glass. When asked whether

3

defendant already had the whole thing in his head that he would go and beat or kill his grandfather, defendant responded, "Yeah."

Defendant also explained that after he arrived at Denny's he had something to eat, went outside, "seen a guy sitting there, and decided to stab him." He said he just decided that he needed to "go over there and stab that guy."

The People charged defendant with one count of murder for each of the two victims (Pen. Code, § 187, subd. (a)[1] -- counts 1 and 2), robbery (§ 211 -- count 3), burglary (§ 459 -- count 4), and the unlawful taking of a vehicle (Veh. Code, § 10851, subd. (a) -- count 5). As to count 1, the People alleged the special circumstance that the grandfather's murder had occurred in the commission of a robbery. (§ 190.2, subd. (a)(17)(a).) As to counts 1 and 2, the People alleged a multiple murder special circumstance. (§ 190.2, subd. (a)(3).) As to counts 1 through 4, the People alleged defendant had personally used a knife. (§ 12022, subd. (b)(1).) Finally, as to counts 1, 3, 4, and 5, the People alleged defendant had committed crimes on an elderly victim. (§ 667.9, subd. (a).)

The defense presented evidence that defendant did not have any drugs or alcohol in his system at the time of his arrest. A psychiatrist testified that he had evaluated defendant and diagnosed him with schizophrenia. According to the psychiatrist, individuals with schizophrenia may experience delusions, hallucinations, and disorganized thinking.

The jury found defendant guilty on all counts, and found true each of the additional allegations. The next day, the parties presented evidence in the sanity phase of the trial. The jury found defendant sane as to all counts.

---

[1] Undesignated statutory references are to the Penal Code.

The trial court sentenced defendant to life without the possibility of parole on counts 1 and 2. It imposed and stayed sentences on counts 3 through 5 under section 654. The trial court ordered defendant to pay, among other things, a $300 parole revocation fine under section 1202.45.

We provide additional background in the Discussion as relevant to the contentions on appeal.

## DISCUSSION

### I

Defendant contends the trial court coerced the jury into returning adverse verdicts on counts 1 and 3 in the sanity phase of his trial. He claims the trial court gave the impression deliberations would never end unless the jury delivered verdicts.

### A

The jury began its sanity phase deliberations on June 18, 2020. The next day, the jury asked the trial court what a section 1026 evaluation entailed. The trial court quoted section 1026 but said it could not offer facts that had not been presented in evidence at trial. Later that afternoon, the jury indicated they were deadlocked. The trial court noted that the jury had only been deliberating for a day, reminded them they could ask the trial court further questions or review evidence if needed, and dismissed them for the weekend with instructions to return that Monday.

The jury returned on June 22, 2020 and requested several video exhibits and the testimony of several witnesses. On June 23, 24 and 25, the jury asked for readback of additional testimony.

On June 26, 2020, the jury announced verdicts of sanity on counts 2, 4, and 5, but stated it was deadlocked on counts 1 and 3. The jury foreperson told the trial court the jury was split 7-5 and there were no questions the trial court could answer that would help resolve the deadlock. After consulting with counsel off the record, the trial court

5

directed the jury to write down any questions they would like the attorneys to address so that the attorneys could argue the points to the jury.

The jury submitted five questions, asking: "(1) For Count 3 - Robbery – [¶] Was the cell phone the only item considered? What about the house phone, car keys and food? [¶] (2) Present to us that the defendant had/or didn't have a moral understanding of the act of murdering [the grandfather at the time of the crime]. [¶] (3) Explain how a person with a diagnosed mental illness can switch from sane to insane and vice versa in a short matter of time, - How can a person? [¶] (4) What evidence was presented to show that the defendant was morally aware of his actions of murdering [the grandfather]? [¶] (5) Is any information available regarding the defendants psychiatric/medical evaluation at the time of arrest?" After reviewing the questions, defense counsel argued the case was at an impasse. In particular, she argued the questions were not answerable through argument because counsel could not go beyond the evidence that had been introduced at trial. The prosecution countered that the attorneys could apply the evidence presented to the questions, saying the questions indicated the jury could still deliberate. The trial court decided to permit the attorneys to present additional argument, observing that the jury had not been deliberating very long given the extensive time the jurors had spent receiving readbacks of testimony. However, regarding the jury's first question, the trial court responded that the jury could determine that any item of value can be the subject of a robbery. And as for the jury's fifth question, the trial court responded, "the jury is only allowed to make a decision based on the evidence presented in the trial. And you cannot speculate as to what happened if there's no evidence presented. And I don't believe there was evidence presented as far as any evaluation at the time of the arrest."

On June 29, 2020, the attorneys presented additional argument. Among other things, the prosecutor argued that mental illness, by itself, was not sufficient to find legal insanity, and urged the jury to apply the law. She said there was no evidence defendant did not know what he was doing. The prosecutor discussed the witness testimony

6

regarding the elements of insanity and noted that the jury had already considered premeditation, deliberation, and willfulness with respect to the murder counts, and the same evidence applied in the sanity phase.

According to defense counsel, although the defense had the burden to prove defendant was insane, the defense only needed to establish insanity by a preponderance of the evidence. Defense counsel addressed the jury's third question by discussing the expert testimony that symptoms of mental illness may change over time. She also discussed defendant's delusions and argued defendant was legally insane.

Later that afternoon, the jury returned a verdict finding defendant sane on count 3. The jury indicated it remained deadlocked on count 1. The jury foreperson did not believe the jury had any other questions to pose to the trial court that could assist in reaching a verdict. Noting that the jurors had only deliberated for slightly more than an hour since the additional attorney arguments, the trial court sent the jurors home for the day and directed them to return the following morning for further deliberation.

On June 30, 2020, defense counsel objected to further jury deliberation, saying the jurors had made clear there was nothing else that could change their minds. But the trial court said sending the jury home and having them resume deliberations had worked well in the case. Later that morning, the jury sent the trial court two notes: one stating the jury was deadlocked 8-4 and had no additional questions for the trial court or attorneys, and another indicating that a juror had an appointment later that afternoon. The trial court told the juror to reschedule the appointment and proposed reading CALCRIM No. 3551 [Further Instruction About Deliberations] and repeating the instructions for robbery, murder, and burglary. Defense counsel objected, noting this was the third time the jury had declared it was deadlocked. The trial court explained to counsel that by finding defendant sane for the robbery of the grandfather, the jury had implicitly also found defendant sane for the grandfather's murder, but the jurors did not realize it. The

7

trial court reassured counsel that it would not say such a thing to the jury, but that rereading the instructions would allow the jury to look at the elements.

The trial court proceeded to instruct the jury with CALCRIM No. 3551, gave the jury copies of the robbery, burglary, and murder instructions, and said, "these are the definitions of murder, robbery and burglary. I'd like you to take a look at the definitions of robbery and burglary and murder, the elements. Those are the elements of a crime. One -- generally one, two, three, whatever. Please take a look at those. And then compare them to the elements of murder to see what the similarities are in the counts you've already reached a decision on, robbery and burglary. And see what the differences are. Hopefully, this will be of assistance to you in reaching a decision on that last count. Also, please review CALCRIM number 3450, which is the definition of insanity." The jury continued deliberating for the rest of the afternoon. The next morning, July 1, 2020, the jury found defendant sane on count 1.

B

Section 1140 provides that "the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." " 'The determination whether there is reasonable probability of agreement rests in the discretion of the trial court. [Citations.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." [Citation.]' [Citation.] The question of coercion is necessarily dependent on the facts and circumstances of each case. [Citation.]" (*People v. Sandoval* (1992) 4 Cal.4th 155, 195-196.)

When " 'a jury reports that it has reached an impasse in its deliberations, the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based

on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict.' ([Cal. Rules of Court,] [r]ule 2.1036(a).) [¶] . . . 'If the trial judge determines that further action might assist the jury in reaching a verdict, the judge may: [¶] (1) Give additional instructions; [¶] (2) Clarify previous instructions; [¶] (3) Permit attorneys to make additional closing arguments; or [¶] (4) Employ any combination of these measures.' [Citation.]" (*People v. Salazar* (2014) 227 Cal.App.4th 1078, 1086-1087 (*Salazar*).) The trial court has the discretion to utilize these tools, and we "review the trial court's exercise of discretion for an abuse of discretion." (*Id.* at p. 1088.)

Here, the trial court did not abuse its discretion when it impliedly concluded it was reasonably probable the jury could reach a verdict. The jury first announced it was deadlocked on only the second day of deliberations. The trial court reminded the jury it could ask to review additional evidence and dismissed them for the weekend, and when the jury returned the jury asked for exhibits and for the readback of various testimony over the next four days. After reviewing the evidence, the jury returned verdicts on counts 2, 4, and 5. Thus, when the jury announced it was deadlocked as to counts 1 and 3, it was reasonable for the trial court to conclude that further measures could break the impasse as to those counts. Moreover, as the trial court noted, the jury had only deliberated for a short period of time at that point, given the time the jury had taken for readback of testimony.

Nor was it improper for the trial court to allow the jurors to submit questions for the attorneys to address in further argument. Such an approach has been upheld by California courts. (*Salazar, supra*, 227 Cal.App.4th at p. 1084; *People v. Young* (2007) 156 Cal.App.4th 1165, 1170; see also Cal. Rules of Court, rule 2.1036(b)(3).)

9

Defendant further claims the tone of the prosecution's additional argument put undue pressure on the jurors. But defendant did not object or request an admonishment at trial, forfeiting his contention. (*People v. Thornton* (2007) 41 Cal.4th 391, 454.)

Although defendant argues the trial court's changes to CALCRIM No. 3551 was coercive,[2] we disagree. The change from "juries" to "jurors" in the first line of the instruction tended to focus on individuals rather than the group, but in context it did not significantly alter the meaning of the instruction as a whole. Nor did the insertion of two commas around "if you can do so" in the seventh line significantly change the meaning. The instruction ultimately directed jurors not to change their position just to reach a verdict; the commas did not "defang" the instruction as defendant suggests.

Defendant also argues the trial court gave an incorrect response to the jury question about which items could be considered the subject of the robbery. However, defendant did not object to the trial court's response at the time it was proposed, and thus the challenge is forfeited. (*People v. Boyce* (2014) 59 Cal.4th 672, 699.)

---

[2] The trial court instructed the jury as follows, and we show tracked changes for the purposes of our analysis: "Sometimes ~~juries~~jurors that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict. Please consider the following suggestions: [¶] Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict, if you can do so, without surrendering your individual judgment. Do not change your position just because it differs with that of other jurors or just because you or others want to reach a verdict. Both the People and the defendant are entitled the individual judgment of each juror. It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to reach -- in order to get a fresh perspective. Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you. [¶] Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing using the form my bailiff has given you."

## II

Defendant next argues the trial court should have instructed the jury on theft as a lesser included offense of robbery.

## A

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The crime requires a " 'specific intent to permanently deprive' the victim of his or her property." (*People v. Wilson* (2021) 11 Cal.5th 259, 301.) "Theft is a necessarily included offense of robbery." (*People v. Ledesma* (2006) 39 Cal.4th 641, 715 (*Ledesma*).) The distinguishing element is the use of force or fear. (*People v. Webster* (1991) 54 Cal.3d 411, 443.) "If intent to steal arose after the victim was assaulted, the robbery element of stealing by force or fear is absent." (*Ibid*.)

"As a general rule, 'a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence.' [Citation.] But a court must instruct on such theories only when the record contains ' " 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense. " ' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1163.) The standard of review is de novo. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) Although "we view the evidence in the light most favorable to the defendant" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137), the evidentiary requirement for a lesser included offense instruction "is not satisfied by ' "*any* evidence … no matter how weak." ' " (*Avila*, at p. 705, original italics.)

## B

Defense counsel asked the trial court to instruct the jury on theft as a lesser included offense of robbery using CALCRIM No. 1800 [Theft by Larceny]. Citing *People v. Bradford* (1997) 14 Cal.4th 1005, 1055, the trial court acknowledged that defendant's intent to take the property must have been formed before or during the time

he used force or fear. The trial court said if defendant did not form the required intent until after using force or fear, he did not commit robbery. But the trial court concluded there was not substantial evidence to support the lesser included instruction and denied defendant's request.

During closing argument, defense counsel argued the murder took place in the courtyard of the grandfather's house and then defendant entered the house after the killing because there was evidence of bloody shoe prints going from outside into the house. Defense counsel argued defendant took the cell phone, truck keys and the truck after the murder, and there was no evidence defendant formed the intent to take property prior to or during the killing.

The trial court instructed the jury using CALCRIM No. 540A [Felony Murder] in relevant part as follows: "The defendant must have intended to commit the felony or felonies of robbery or burglary before or at the time he caused the death. It is not required that the person die immediately, as long as the act causing death occurred while the defendant was committing the felony or felonies." The trial court also instructed using CALCRIM No. 730 [Special Circumstances Murder] in relevant part as follows: "The defendant must have intended to commit the felony of robbery before or at the time of the act causing death. In addition, in order for the special circumstance to be true, the People must prove that the defendant intended to commit robbery independent of the killing. If you find that the defendant only intended to commit murder and the commission of robbery was merely part of or incidental to the commission of that murder, then the special circumstances has not been proved." In addition, the trial court instructed with CALCRIM No. 1600 [Robbery] in pertinent part as follows: "The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery."

12

C

In *People v. Turner* (1990) 50 Cal.3d 668 (*Turner*), the defendant testified he stabbed the victim to death in response to the victim's sexual advances and stole items from the victim after the murder. (*Id.* at pp. 684-685.) On appeal, the defendant argued his testimony that he killed in response to the victim's advances and only thereafter decided to take property was substantial evidence that he did not steal by force or fear and an instruction on theft as a lesser included offense should have been given. (*Id.* at p. 690.) The California Supreme Court acknowledged that the lesser included instruction would have been justified, but concluded any error was harmless because "the instructions actually given and the verdicts actually rendered persuade us beyond doubt that the jury considered the question of 'after-formed intent' and rejected this 'mere theft' theory on its merits." (*Id.* at p. 691.) The given instructions "made clear beyond doubt that defendant was not guilty of robbery, first degree felony murder, or the sole special circumstance charged, if his intent to steal arose only after the fatal assault. In finding for the prosecution on all robbery issues, the jury thus necessarily concluded that [the defendant] decided to steal before assaulting [the victim.]" (*Ibid.*) The California Supreme Court reached similar conclusions in *People v. Sakarias* (2000) 22 Cal.4th 596 and *People v. Yeoman* (2003) 31 Cal.4th 93.

Here, even if the trial court should have instructed the jury on theft as a lesser included offense, and whether the standard is under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] or *People v. Watson* (1956) 46 Cal.2d 818, any error was harmless. (*People v. Sakarias, supra*, 22 Cal.4th at p. 621.) The trial court instructed the jury with CALCRIM Nos. 540A, 730, and 1600, each of which highlighted the intent requirement of robbery. Both counsel in closing argument also explained that to convict on robbery, defendant had to form the intent to take property before or during the murder. The jury found defendant guilty of robbery and found true the robbery-murder special circumstance allegation. (See *People v. Mejia* (2012) 211 Cal.App.4th 586, 627 ["jurors

13

are presumed to follow the law as given to them by the trial court"].)  Just as in *Turner*, *Sakarias*, and *Yeoman*, the jury necessarily concluded that defendant decided to steal before the killing.

Defendant argues the jury was also instructed with CALCRIM No. 376, which permitted the jury to find robbery without resolving the timing issue.  But CALCRIM No. 376 only discusses the kinds of evidence that may be considered for a robbery charge; it does not allow the jury to disregard other instructions.  Indeed, the instruction included a specific admonition that the jury must consider each element for the charge before finding defendant guilty.

Defendant cites *People v. Ramkeesoon* (1985) 39 Cal.3d 346, which found prejudicial error in a failure to give a theft instruction.  But in *Turner, supra*, 50 Cal.3d at pages 692-693, the California Supreme Court distinguished *Ramkeesoon* because the instructions in that case did not highlight the timing of intent.  We conclude any error was not prejudicial.

III

Defendant argues defense counsel was ineffective in failing to ask that the jury be instructed with CALCRIM Nos. 3428 and 627.[3]  He claims his core defense at trial was

---

[3] CALCRIM No. 3428 provides, in relevant part:  "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder).  You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state."  CALCRIM No. 627 provides:  "A hallucination is a perception not based on objective reality.  In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening.  [¶]  You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation.  If the People have not met this burden, you must find the defendant not guilty of first degree murder."

that he lacked the mental state to commit murder, robbery or burglary, and there was no conceivable reason not to request the instructions.

To establish ineffective assistance of counsel, defendant "must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674].) The reviewing court does not need to determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant. (*Strickland*, at p. 698.) "We need not inquire into why counsel failed to request an additional pinpoint instruction" where "the court fully apprised the jury of the law applicable to defendant's mental state defenses, and no additional instruction was necessary." (*People v. Smithey* (1999) 20 Cal.4th 936, 987.) "We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831 (*Larsen*).)

Defendant has not established prejudice. Although CALCRIM No. 3428 provides guidance on how the jury may consider evidence of mental illness, it "does not delineate or describe an element of an offense. Rather, it is a pinpoint instruction relating particular facts to a legal issue in the case. [Citation.]" (*Larsen, supra*, 205 Cal.App.4th at p. 830.) Here, the jury instructions as a whole adequately stated the applicable law and instructed the jury on the necessary elements of each claim. For example, the instructions included CALCRIM Nos. 225 and 252 concerning intent, CALCRIM No. 332 regarding the treatment of expert testimony, such as that offered by Dr. Robert Hart about defendant's mental illness, and instructions on the elements of each charged crime. Nothing in the jury instructions precluded the jury from fairly assessing the extensive evidence of defendant's mental state in its deliberations. Defense counsel argued the law and the evidence to the jury, including the issue of defendant's intent.

15

The omission of CALCRIM No. 3428 did not result in a misstatement of the intent elements or leave jurors with any misconception that they should discount the evidence of defendant's mental illness. "Nothing in the instructions or argument precluded the jury from at least assessing the mental disorder evidence -- and specifically the expert testimony -- on the issue of intent." (*Larsen, supra*, 205 Cal.App.4th at p. 833.)

The same is true with respect to CALCRIM No. 627. The jury received evidence about the delusions or hallucinations defendant experienced. And defense counsel made arguments specific to the delusions and defendant's mental state. The issue of defendant's hallucinations or delusions was clearly presented at trial and the jury resolved that issue against defendant.

Defendant argues the length of the jury's deliberations during the sanity phase of the trial indicates prejudice because the jury was hesitant to make adverse findings. But because the burden of proof and the evidence permitted in the sanity phase was so dissimilar to that of the guilt phase, the comparison is not helpful. (§ 1026; see also *People v. Elmore* (2014) 59 Cal.4th 121, 141, fn. omitted ["Evidence of the defendant's mental state may not be admitted at the guilt phase to prove insanity. [Citations.] If the defendant is found guilty, the trial proceeds to the sanity phase, where the defendant bears the burden of proof by a preponderance of the evidence."].)

On this record, a more favorable outcome would not have been likely if the jury had been instructed with CALCRIM Nos. 627 and 3428.

IV

Defendant further contends the verdict form for the felony-murder special circumstance on count 1 was insufficient because it allowed the jury to find the allegation true based on defendant's participation in a robbery *or* a burglary, despite the fact that the information only alleged participation in a robbery. The People counter that the contention is forfeited because defendant did not assert it in the trial court. We exercise our discretion to address the argument and find that it lacks merit.

16

## A

As to count 1, the information alleged a robbery-murder special circumstance under section 190.2, subdivision (a)(17)(A). At the close of evidence, the trial court instructed the jury with CALCRIM No. 730, among other instructions, saying in part: "The defendant is charged with a special circumstance of murder committed while engaged in the commission of robbery, a violation of . . . section 190.2(a)(17), as to Count 1. To prove this special circumstance is true, the People must prove that: One, the defendant committed robbery. Two, the defendant intended to commit robbery. And the defendant did an act that caused the death of another person." The jury returned the following verdict on the special circumstance finding: "We, the jury in the above-entitled cause, find true the Special Circumstance of Murder in the Commission of a Felony, i.e., Robbery or Burglary, within the meaning of . . . section 190.2(a)(17)."

## B

" ' "A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court." ' " (*People v. Jones* (1997) 58 Cal.App.4th 693, 710.) " 'The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed.' [Citation.] '[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice.' " (*Id.* at pp. 710-711; see *People v. Webster* (1991) 54 Cal.3d 411, 447.) " ' "There are innumerable authorities which declare that the form of the verdict is immaterial if the intention to convict of the crime charged is unmistakably expressed. [Citations.]" [Citations.] [¶] In *People v. Reddick* [(1959) 176 Cal.App.2d 806 [1 Cal. Rptr. 767]], the court stated: "No particular form of verdict is required, so long as it clearly indicates the intention of the jury to find the defendant guilty of the offense with which he is charged. It is sufficient if it finds him guilty by

17

reference to a specific count contained in the information.  [Citations.]"  [Citation.]'
[Citations.]"  (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1273.)

Here, the inclusion of "Burglary" on the verdict form is a clear technical defect.
The trial court instructed the jury on the requirements for a robbery-murder special
circumstance, not a burglary-murder special circumstance, and nothing in the jury
instruction referenced burglary.  The trial court also explained the verdict form to the jury
before deliberations, saying, "[t]he next one is the special circumstance of murder while
engaged in the commission of robbery.  True, not true."  Both of these statements were
consistent with the information, which alleged a robbery-murder special circumstance.
Even if the prosecutor misspoke during closing arguments by mentioning burglary, the
jury could not have convicted defendant on a basis for which it was not instructed.  Read
together with the information and the jury instructions, the intention of the jury is clear
from the verdict form, and we decline to reject the verdict because of a technical error in
the form. (*People v. Camacho, supra*, 171 Cal.App.4th at p. 1274.)

V

In addition, defendant claims he was entitled to a mistrial after three witnesses
referenced the fact that he had been incarcerated.

A

Before trial, defendant moved to exclude evidence of any prior convictions or
criminal conduct. The motion was not resolved before trial.  During the trial, the
following references were made to defendant's prior imprisonment:

First, the prosecutor asked defendant's brother for an example of "delusional"
statements defendant had made, and the brother responded, "That -- that he -- that he
would just fight people in prison just because.  Like he -- he enjoyed it, things like that."
Defense counsel objected and the parties had a bench conference they later placed on the
record, saying, in relevant part, that counsel should admonish their respective witnesses
not to mention the fact that defendant had been in prison.  Defense counsel declined the

18

trial court's offer of an admonition to the jury, saying she did not want to draw attention to the statement.

Second, the prosecutor asked defendant's mother whether she communicated with defendant during a six-year period of time when she was living in Tennessee. The mother responded, "I came to see him once when he was in jail." Defense counsel objected and the trial court struck the answer. At a break in the trial, defense counsel moved for a mistrial, saying this was the second witness who had made such a statement. The prosecutor explained she had admonished the witness not to talk about jail or prison, but defendant had "spent the majority of his life in contact with law enforcement in jail and in prison," so much of his family's contact with him would have happened when he was incarcerated. The trial court observed that although the statement was inappropriate, there had been many witnesses and the error had not been intentional on the part of the prosecution. The trial court concluded defendant had not been prejudiced by the statement, and the motion for mistrial was denied. Defense counsel initially requested an admonition for the jury, but later withdrew the request.

Third, during the sanity phase of the trial, the prosecutor asked Dr. John Chellsen about defendant's state of mind at the time of the murders, and Dr. Chellsen responded, "With respect to the first homicide, he said that he was angry, that he had been holding a grudge for many years, and the sexual assaults he had experienced while he was in prison intensified those feelings." Defense counsel objected, and in a sidebar, the prosecutor explained she had cautioned the witness not to discuss any of the issues associated with Missouri, which she understood to encompass defendant's time in prison. The trial court stated it did not believe the comment required a mistrial but struck the answer and admonished the jury to disregard the last statement made by the witness.

Shortly thereafter, Dr. Chellsen confirmed defendant had said he "caught this case," which Dr. Chellsen explained meant defendant had been arrested. The prosecutor

19

attempted to ask a clarifying question, defense counsel objected, and the clarifying question was stricken.

B

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged," and we apply "the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555 (*Bolden*).) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*).)

"A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice." (*Ledesma, supra*, 39 Cal.4th at p. 683.) However, the improper subject matter will rarely be " 'of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.) Deciding "whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) Reversal is required only if it is reasonable probable that the volunteered comments could have affected the outcome of the trial. (*Ibid.*)

As an initial matter, defendant asserts the prosecutor's failure to admonish and control her witnesses was deliberate. But defendant did not claim prosecutorial misconduct in the trial court, and thus any such assertion is forfeited. (*People v. Redd* (2010) 48 Cal.4th 691, 734.) In any event, nothing suggests the prosecutor intentionally solicited improper testimony. (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) The references to defendant's past imprisonment were brief and do not appear to have been offered in response to questions designed to solicit such information. To the contrary, the improper testimony appears to have been inadvertent.

20

Although four instances of improper testimony occurred over the course of the trial, the trial court struck the testimony and admonished the jury not to consider the potentially prejudicial evidence, both when requested by defense counsel and in the general jury instructions. We must presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) "Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured." (*People v. Martin* (1983) 150 Cal.App.3d 148, 163; see also *People v. Seiterle* (1963) 59 Cal.2d 703, 710 [it is only in "exceptional cases" where "the improper subject matter is of such a character that its effect on the minds of the jurors cannot be removed by the court's admonitions"].) Here, nothing suggests the jury failed to follow the trial court's admonitions and instructions.

It is unlikely that defendant would have realized a more favorable result had the jury not heard the references to defendant's prior incarceration. The jury heard graphic evidence detailing the stabbings of both the victims, which was far more damaging than the fact that defendant had previously been incarcerated.

We conclude the record "demonstrates the absence of any incurable prejudice of the sort that would require the granting of a motion for a mistrial." (*People v. Jenkins* (2000) 22 Cal.4th 900, 986.) The trial court could reasonably conclude that the references to defendant's past imprisonment did not irreparably damage defendant's chances of receiving a fair trial, and it did not abuse its discretion by denying the mistrial motion.

VI

Defendant argues the trial court incorrectly imposed a $300 parole revocation fine under section 1202.45, even though it sentenced him to life without the possibility of parole. The People agree the fine should be stricken, as do we.

21

Section 1202.45 provides, in relevant part: "(a) In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." The fine shall be suspended unless parole is revoked. (§ 1202.45, subd. (c).)

Where the only sentence imposed is life without the possibility of parole, there is no parole eligibility and the fine is not applicable. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185.) When a defendant's current sentence does not presently allow for parole, and there is no evidence it ever will, no additional parole revocation fine should be imposed, and any such fine should be stricken. (*Ibid.*)

Here, the trial court imposed a $300 parole revocation fine shortly after sentencing defendant to two consecutive life terms without the possibility of parole. The trial court also imposed determinate terms for the burglary, robbery, and taking of a vehicle counts, but stayed those terms under section 654. Because defendant's sentence does not currently allow the possibility of parole, the parole revocation fine is inapplicable, and should be stricken.

To the extent a parole revocation fine is required because defendant was also sentenced to determinate terms (see *People v. Brasure* (2008) 42 Cal.4th 1037, 1075), those terms were stayed under section 654. In that situation the parole revocation fine is not applicable because "section 654 prohibits the use of a conviction for any punitive purpose if the sentence on that conviction is stayed" (*People v. Pearson* (1986) 42 Cal.3d 351, 361), and the section 1202.45 fine is considered punitive for ex post facto purposes (*People v. Cruz* (2012) 207 Cal.App.4th 664, 672, fn. 8).

## DISPOSITION

The judgment is modified to strike the $300 parole revocation fine under section 1202.45. As modified, the judgment is affirmed. The trial court shall prepare an

amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

/S/
MAURO, Acting P. J.

We concur:

/S/
RENNER, J.

/S/
HOCH, J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.